**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WILLIAM P. LIPTROT<br>29 Tempo Road<br>Levittown, PA 19056<br><br>Plaintiff,<br><br>v.<br><br>DRÄGER MEDICAL SYSTEMS, INC.<br>3135 Quarry Road<br>Telford, PA 18969<br><br>Defendant. | CIVIL ACTION<br><br>No.:____________________<br><br>**JURY TRIAL DEMANDED** |

**CIVIL ACTION COMPLAINT**

Mr. William P. Liptrot ("Plaintiff," or "Mr. Liptrot,") by and through his undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1. Mr. Liptrot has initiated this action to redress violations by Dräger Medical Systems, Inc. ("Defendant") of Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA" - 29 U.S. Code § 1132), the Pennsylvania Wage Payment and Collection Law (" WPCL" - 43 P.S. § 260.1 et seq.) and Pennsylvania Common Law.

2. Mr. Liptrot was a model long-term employee who was lauded for his contributions to Defendant for nearly two (2) decades. He then agreed to stay on and help wind down operations for Defendant's Telford, PA headquarters in continued dedication to Defendant, his position, and his colleagues. Mr. Liptrot even told his supervisor that he wanted to be the last person at Telford to effectively "turn off the lights."

3. However, instead of being bestowed with the honor deserved of a captain going down with his ship, Defendant willfully terminated Mr. Liptrot's employment and intentionally and falsely designated his termination as "for cause" without ever even interviewing him before making the decision in a span of five (5) days. All this in an ill-fated ruse to avoid paying Mr. Liptrot contractually owed severance and retention bonuses to save money as the company was moving operations to Germany.

4. As a direct consequence of Defendant's unlawful actions, Mr. Liptrot seeks damages as set forth herein.

## JURISDICTION AND VENUE

5. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1367 because it arises under the laws of the United States and seeks redress for violations of federal laws and supplemental jurisdiction over Plaintiff's state law claims that share a common nucleus of operative fact.

6. This Court may properly assert personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

7. Pursuant to 28 U.S.C. § 1391(b)(1)-(2), venue is properly laid in this district because the events giving rise to this lawsuit occurred here and Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

8. Mr. Liptrot has properly exhausted all administrative remedies under Defendant's U.S. Severance Benefit Plan and Summary Plan Description (the "Plan").

9. Mr. Liptrot now brings the instant action within 180 days of Defendant's final denial of Mr. Liptrot's appeal for benefits under the Plan issued on June 12, 2026.

## PARTIES

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Mr. Liptrot is an adult individual, with an address as set forth in the caption.

12. Defendant is a wholly owned subsidiary of Drägerwerk AG & Co. KGaA, commonly known as Dräger, a German company that develops, manufactures, and sells devices and systems in the fields of medical and safety technology and generates billions of dollars of revenue each year.

13. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

14. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

15. On or about August 5, 2005, Defendant hired Mr. Liptrot and employed him for over twenty (20) years, most recently as the Vice President of Research and Development and Global Functions at its Telford, PA headquarters.

16. In his role, Mr. Liptrot most recently earned $249,000 per year plus ancillary benefits.

17. During his long and illustrious tenure of employment, Mr. Liptrot was a high performing employee and was well known for his effective leadership, integrity, stewardship of Defendant, and his level-headed demeanor.

**Defendant Institutes Project Bestwo to Close Telford, PA**

18. In or about March 2025, Defendant informed Mr. Liptrot that it was initiating "Bestwo," pursuant to which Defendant intended to wind down certain operations at its Telford, Pennsylvania facility and transition those operations to Germany.

19. As a senior executive with approximately twenty years of institutional knowledge and experience, Mr. Liptrot was tasked with assisting Defendant in accomplishing this transition. This included serving as the point person in Telford to make sure the transition went smoothly, managing the day-to-day activities of continuing business, working with HQ and Telford to do what was necessary to effectuate closure, and continuing to perform his normal functions as VP of R&D.

20. Mr. Liptrot was called the "point man" and told explicitly that Defendant could not effectuate the Telford closure without him. Essentially, Defendant wanted Mr. Liptrot to ensure an orderly wind-down of operations, make sure that business continued through the closure, that key people were not jumping ship, and be a steadying and calming presence in light of the forthcoming closure.

21. As part of his employment with Defendant, Mr. Liptrot was an Eligible Employee under the Plan and entitled to at least thirty-six (36) weeks of severance, or $172,384.62, upon his separation from Defendant.

22. On or about March 27, 2025, Defendant and Mr. Liptrot entered into an agreement to acknowledge his "value" to Defendant and to "obtain his commitment to continue to serve in

his position as Vice President, Global Functions Telford, through and including March 27, 2027." *See* the "Retention Agreement" attached hereto as Exhibit "A."

23. Specifically, the Retention Agreement provided that two (2) bonus payments in the gross amount of $25,000 each, which would be paid to Mr. Liptrot provided that he remained employed with Defendant through March 27, 2026, and March 27, 2027, respectively.

24. Defendant specifically characterized these payments as "extraordinary compensation" and a "special bonus payment."

25. Importantly, if Defendant terminated Mr. Liptrot's employment for any reason other than for "Cause," Defendant was contractually obligated to pay Mr. Liptrot the entire Retention Bonus amount.

26. The Plan and Retention Agreement contain materially different definitions of "Cause," and Defendant's determination under one does not establish Cause under the other.

27. Specifically, the Retention Agreement defines "For Cause" as follows:

(A) your failure to perform material duties of your position, and such failure, if correctable (as determined by Draeger in its sole discretion), remains uncorrected for a period of up to five (5) days after receipt by you of written notice of such failure from Draeger, which notice shall contain a reasonably specific description of such breach and the specific reasonable correction requested by Draeger;

(B) any reckless or grossly negligent act by you having the foreseeable effect of injuring the interest, business, or reputation of Draeger, or any of its parent, subsidiaries, or affiliates in any material respect.

(C) your evidenced impairment by or use of any illegal drug, or illegal narcotic, or excessive amounts of alcohol (as determined by Draeger in its reasonable discretion) on Draeger property, while performing Draeger work (including at a customer site) or at a function where you are working on behalf of Draeger.

(D) the indictment on charges or conviction for (or the procedural equivalent or conviction for) or entering of a guilty plea or plea of no contest with respect to, a felony.

(E) the conviction for (or the procedural equivalent or conviction for) or entering of a guilty plea or plea of no contest with respect to, a misdemeanor which, in Draeger's reasonable judgment, involves moral turpitude, deceit, dishonesty or fraud.

(F) conduct by or at the direction of you constituting misappropriation or embezzlement of the property of Draeger, or any of its parents or affiliates.

(G) a breach by you of fiduciary duty or duty of loyalty owing to Draeger, including the misappropriation of (or attempted misappropriation of) a corporate opportunity or undisclosed self-dealing.

(H) a material breach of any of Draeger's written Human Resources or other company policies, which breach, if correctable (as determined by Draeger in its sole discretion), remains uncorrected for a period of up to five (5) days after receipt by you of written notice of such breach from Draeger, which notice shall contain a reasonably specific description of such breach and the specific reasonable correction requested by Draeger; or

(I) a material breach by you of any material provision of this Agreement, which breach, if correctable (as determined by Draeger in its sole discretion), remains uncorrected for a period up to five (5) days after receipt by you of written notice of such breach from Draeger, which shall contain a reasonably specific description of such breach and the specific reasonable correction requested by Draeger.

28. The Plan defines "Cause" as any of the following incidents by an employee, as determined by Defendant:

- an employee's violation of any material provision of Draeger U.S. or Dräger Company's policies;
- an employee plays a part in any act of theft or dishonesty;
- an employee participates in any act, that could reasonably be expected to have or had a detrimental effect on the business or reputation of Draeger U.S. or any Dräger Company;
- any material failure by an employee to perform reasonably requested tasks at an acceptable standard of performance without sufficient effort to improve or correct such performance, as determined by such employee's manager; or
- an employee participates in financial accounting improprieties which results or could reasonably be expected to result in material harm to Draeger U.S. or any Dräger Company.

**Mr. Liptrot Offers to Meet With his Colleagues to Discuss Their Concerns**

29. Understandably, many employees had confided in Mr. Liptrot that they were upset that Defendant was closing Telford and that many, if not all, of Defendant's employees would soon be out of a job. Mr. Liptrot offered to meet with anyone who wanted to and have an open discussion about the closure.

30. On or about August 5, 2025, Mr. Liptrot attended a team lunch with employees affected by Defendant's ongoing transition of operations from Telford.

31. During the lunch, Mr. Liptrot encouraged employees to candidly discuss their concerns regarding the transition and Defendant's handling thereof – all in an effort to fulfill his responsibilities under Bestwo and help make the transition and closure of Telford as smooth as possible for Defendant. This discussion on the closure of Telford lasted approximately ten (10) minutes with the remainder of the lunch spent team building.

32. Defendant subsequently (and falsely) asserted that Mr. Liptrot had made unauthorized promises to employees regarding their anticipated employment and severance benefits, represented that he possessed sole decision-making authority concerning such matters, disclosed confidential information regarding a prior workplace investigation, disparaged Human Resources, instructed employees to conceal information from Human Resources, and threatened employees with retaliation.

33. On or about August 11, 2025, Defendant's Director, Human Resources ("HR") Business Partner Danielle Baker ("Baker") authored and delivered to Mr. Liptrot a letter terminating his employment with Defendant (the "Termination Letter") attached hereto as Exhibit "B."

34. The Termination Letter outlined that Defendant had determined that Mr. Liptrot's termination was "for cause" under the terms of both the Plan and Mr. Liptrot's Retention Agreement.

35. Defendant's Termination Letter designated Mr. Liptrot's termination as "for cause" under the Plan and as "For Cause" under the independently defined standard contained in the Retention Agreement.

36. As outlined infra, Defendant's designation of Plaintiff's termination as "for cause" under the Plan was an abuse of the Plan Administrator's discretion, *and* did not satisfy the independently defined contractual standard of "Cause" under the Retention Agreement.

37. Defendant provided Mr. Liptrot no written notice or opportunity to cure before terminating his employment.

38. Defendant later asserted that the alleged conduct was not correctable because the purported "damage was already done," notwithstanding the Retention Agreement's express notice-and-cure provisions applicable to certain categories of alleged Cause. To be clear, there was no "damage" that was already done.

39. The Termination Letter stated that Mr. Liptrot was not eligible for severance benefits under the Plan, or for any retention bonus under the Retention Agreement, but importantly did not provide Mr. Liptrot the Plan, any claims procedures, or otherwise informed him of any administrative appeal rights.

**Defendant’s Arbitrary and Flawed “Investigation”**

40. The investigation underlying Defendant's designation of Mr. Liptrot's termination as “for cause” was materially flawed and outcome-driven.

41. Defendant's investigation commenced on or about August 6, 2025. Just two (2) days later, on August 8, 2025, Defendant's senior leadership was already deliberating concerning Mr. Liptrot's termination. Three (3) days later, on August 11, 2025, Defendant terminated his employment.

42. At no time during this process did Defendant interview Mr. Liptrot or provide him with an opportunity to respond to the allegations against him.

43. In fact, Defendant's investigative materials expressly identified Mr. Liptrot as the “Subject of inquiry” and affirmatively stated that he “will not be interviewed at this time.”

44. Thus, although Defendant interviewed employees concerning allegations against Mr. Liptrot, it made a *deliberate* decision not to obtain Mr. Liptrot's account before determining that those allegations constituted “Cause” and terminating his employment.

45. Although Defendant later characterized the allegations as corroborated by numerous witnesses, its own investigative materials reveal substantial disagreement among the employees interviewed concerning the material allegations against Mr. Liptrot.

46. Several firsthand witnesses expressly rejected Defendant's characterization of Mr. Liptrot's conduct calling Defendant’s allegations, “laughable,” a “joke,” and “outright ridiculous.”

47. In fact, Mr. Liptrot’s colleagues described him as “one of the only people of integrity at Draeger.” Mr. Liptrot was also described as “supportive,” “understanding,” “genuine,” and “a company guy who looked out for everyone.”

48. Firsthand witnesses also denied that Mr. Liptrot threatened employees, instructed employees not to communicate with Human Resources, disparaged Human Resources, or improperly disclosed confidential investigative information.

49. Defendant nevertheless discounted employees who failed to corroborate its allegations as biased toward Mr. Liptrot, speculating that such employees were withholding information because they hoped Mr. Liptrot would extend their employment. Defendant thereby treated evidence supporting its anticipated conclusion as credible while discounting materially contrary evidence on speculative grounds.

50. For example, although Defendant concluded that Mr. Liptrot threatened employees with retaliation if they disclosed the contents of an August 5, 2025, team lunch, the administrative record reflects that this conclusion rested principally upon one employee's subjective interpretation of Mr. Liptrot's statements.

51. Other firsthand witnesses understood Mr. Liptrot's comments to help create a supportive forum in which employees facing the closure of the Telford operation could candidly express their concerns.

52. Likewise, although Defendant accused Mr. Liptrot of improperly disclosing details of a prior confidential workplace investigation, Defendant's own investigative materials acknowledged that the specifics of any discussion concerning the former employee were “unclear or inconsistent” and established, at most, that the former employee was mentioned. Defendant nevertheless transformed this equivocal evidence into a categorical finding that Mr. Liptrot improperly disclosed confidential investigative information.

53. Defendant's investigation also characterized the August 5 lunch as “mandatory.” Yet the contemporaneous written invitation, sent by Colleen Raposa (“Raposa”) to employees,

stated only, "Please try to attend as [Pete] wanted to have lunch as a team," materially undermining Defendant's subsequent characterization of the meeting as mandatory.

54. To be clear, Mr. Liptrot had not directed Raposa to make the meeting mandatory in any fashion.

55. At least two firsthand attendees specifically denied interpreting Mr. Liptrot's statements as threatening. Instead, they understood his invitation to be candid as an effort to allow employees to openly discuss their concerns regarding the impending closure. One attendee even characterized the purpose as the "exact opposite" of threatening employees.

56. Defendant's investigative materials even assigned an "assumed Lack of credibility" to a potential witness **who had not been interviewed**, further demonstrating that credibility assessments were being made before relevant witnesses **had even been heard**.

57. Although Defendant ultimately characterized Mr. Liptrot's comments as threatening retaliation, its investigation identified **no instance** in which Mr. Liptrot actually retaliated against the complaining employee or any other employee.

58. Defendant nevertheless characterized this abbreviated and one-sided process as a "thorough investigation" that had "confirmed" the accusations against Mr. Liptrot, despite never interviewing Mr. Liptrot and despite materially conflicting accounts from firsthand witnesses.

59. Certain evidence Defendant subsequently relied upon to support its "Cause" determination **was not even created until well after Mr. Liptrot's termination**.

60. Specifically, the sworn declaration of the employee whose interpretation formed the basis of Defendant's retaliation allegation was not executed until November 26, 2025, more than three months after Defendant had already terminated Mr. Liptrot for purported Cause.

61. Defendant's administrative review did not cure these defects. Rather, Defendant continued to credit evidence supporting its predetermined conclusion while discounting materially contrary firsthand evidence.

62. Moreover, even where the administrative record established that certain conversations occurred, Defendant failed to reasonably connect the evidence concerning those conversations to the specific requirements for “Cause” under the Plan.

63. Accordingly, even accepting the materials Defendant assembled into the administrative record, the record lacked a reasonable evidentiary basis for finding that Mr. Liptrot engaged in conduct satisfying the Plan's definition of “Cause.”

**The ERISA Appeals Process**

64. On or about September 22, 2025, Mr. Liptrot (via counsel) sent Defendant a letter contesting Mr. Liptrot’s termination for cause and demanding preservation of evidence.

65. On or about October 10, 2025, Defendant, through counsel, responded to Mr. Liptrot’s September 22, 2025 correspondence, maintained that Mr. Liptrot had been properly terminated “for cause” and was not entitled to severance benefits, and, for the first time, advised Mr. Liptrot that any formal claim for benefits was required to be submitted to the Plan Administrator pursuant to the claims procedure contained in the Plan.

66. Prior to Defendant's October 10, 2025, correspondence, neither Defendant nor the Plan Administrator had provided Mr. Liptrot with the Plan document or advised him of the Plan's claims procedure.

67. After Defendant's counsel first referenced the Plan’s claims procedure, Mr. Liptrot promptly requested a copy of the Plan on October 15, 2025.

68. After receiving the Plan, Mr. Liptrot submitted a formal claim for benefits to the Plan Administrator on October 23, 2025.

69. On or about February 25, 2026, Defendant denied Mr. Liptrot's request for benefits under the Plan claiming that he was terminated "for cause" and his claim was untimely. *See* February 25, 2026, Denial Letter attached hereto as Exhibit "C."

70. On or about April 10, 2026, Mr. Liptrot appealed this denial arguing that his claim was timely, and again, that his termination was without cause and that the evidence did not reasonably support a determination that his termination was for Cause under the Plan.

71. On or about June 12, 2026, Defendant sent a final denial of Mr. Liptrot's appeal. *See* June 12, 2026, Appeal Denial Letter attached hereto as Exhibit "D."

72. As a result of Defendant's Cause determinations, Mr. Liptrot was denied approximately $172,384.62 in severance benefits under the Plan, and an additional $50,000.00 in compensation due under the Retention Agreement.

## COUNT I
## Violations of ERISA § 502(a)(1)(B)
## (Recovery of Benefits)

73. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

74. Mr. Liptrot was a participant in and Eligible Employee under the Plan.

75. Pursuant to 29 U.S.C. § 1132(a)(1)(B), Mr. Liptrot is entitled to bring this action to recover benefits due to him under the terms of the Plan and to enforce and clarify his rights thereunder.

76. Mr. Liptrot has exhausted his administrative remedies under the Plan.

77. The Plan Administrator possessed discretionary authority to determine eligibility for benefits and interpret the terms of the Plan.

78. For the reasons set forth above, the determination that Mr. Liptrot was terminated "for Cause" was unsupported by substantial evidence, arbitrary and capricious, and an abuse of discretion.

79. In determining Mr. Liptrot's entitlement to benefits, the Plan Administrator operated under a conflict of interest because Defendant both administers the benefits provided by the Plan and serves as a fiduciary for purposes of making claim determinations with regard to the Plan.

80. As a result, Mr. Liptrot was improperly denied severance benefits due to him under the terms of the Plan.

81. Based on the foregoing, Mr. Liptrot seeks the payment of severance benefits, interest thereon, a clarification of rights, attorneys' fees, and any other equitable relief to redress said violations.

**COUNT II**
**Violations of the Pennsylvania Wage Payment and Collection Law ("PA WPCL")**
**(Failure to Pay Wages)**

82. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

83. Defendant was Mr. Liptrot's employer as defined by the PA WPCL.

84. Pursuant to the PA WPCL, wages include "all earnings of an employe, regardless of whether determined on time, task, piece, commission or other method of calculation." Wages

also include "fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employes' pay by the employer." 43 P.S. § 260.2a.

85. Pursuant to Mr. Liptrot's Retention Agreement, Defendant promised to pay him wages in exchange for work he performed. The Retention Agreement further promised that if Defendant terminated Mr. Liptrot before the end of the Retention Period for any reason other than "For Cause," Defendant would pay him the full Retention Bonus in the amount of $50,000.00.

86. Defendant itself characterized the Retention Bonus as "extraordinary compensation" and a "special bonus payment."

87. Mr. Liptrot satisfied the conditions of the Retention Agreement and substantially performed his work in serving as the Vice President, Global Functions Telford, Medical & Safety of Draeger to help Defendant meet its commitments to Project Bestwo.

88. Defendant had no cause to terminate Mr. Liptrot and his termination was involuntary and for reasons not meeting the definition of "For Cause" under the Retention Agreement.

89. Defendant failed to pay Mr. Liptrot his earned wages.

90. Plaintiff is entitled to unpaid wages through the date of judgment, liquidated damages, costs, legal fees, and other penalties, as Defendant violated the PA WPCL.

**COUNT III**
**Breach of Contract**
**(Failure to Pay Retention Bonus)**

91. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

92. This count is pled in the alternative only if the Court finds Mr. Liptrot's Retention Bonus is not "wages" under the WPCL.

93. Pursuant to Mr. Liptrot's Retention Agreement, Defendant promised to pay him wages in exchange for work he performed. The Retention Agreement further promised that if Defendant terminated Mr. Liptrot before the end of the Retention Period for any reason other than "For Cause," Defendant would pay him the full Retention Bonus in the amount of $50,000.00.

94. Mr. Liptrot satisfied the conditions of the Retention Agreement and substantially performed his work in serving as the Vice President, Global Functions Telford, Medical & Safety of Draeger to help Defendant meet its commitments to Project Bestwo.

95. Defendant had no cause to terminate Mr. Liptrot and his termination was involuntary and for reasons not meeting the definition of "For Cause" under the Retention Agreement.

96. Defendant failed to pay Mr. Liptrot his Retention Bonus.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay, retention compensation, and Plan benefits Plaintiff would have received had it not been for Defendant's illegal actions. Plaintiff should be accorded those benefits illegally

withheld from the date he first suffered unlawful practices at the hands of Defendant until the date of verdict including pre- and post-judgment interest;

B. Plaintiff is to be awarded punitive and/or liquidated damages, as permitted by applicable law(s) asserted herein, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate;

D. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

E. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

F. Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: ______________________

Ari R. Karpf, Esq. (91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
(215) 639-0801
akarpf@karpf-law.com
*Attorneys for Plaintiff*

Dated: August 26, 2026

# Exhibit A

Dräger

**To:** Pete Liptrot

**From:** Stephanie Moody

**Date:** March 27, 2025

**Subject:** Retention Bonus Program

Please review the e attached Retention Agreement regarding your commitment to Draeger with respect to Project Fulcrum. You must fulfill all terms of the Retention Agreement to receive the Retention Bonus Payments described in the Agreement.

This Retention Agreement is withdrawn and null and void if not signed and returned to Stephanie Moody by 5:00 PM Eastern Time on **April 3, 2025**, unless otherwise determined by the parties.

- **To accept the Retention Agreement, please sign the last page of the Agreement and return the full Retention Agreement with your signature to me.**

If you have questions, please contact mer. I am here to assist and support you with any questions related to this document.

Thank you for your continued commitment to Draeger's success.

# RETENTION AGREEMENT

This Retention Agreement ("Agreement") is entered into and made effective as of March 27, 2025, by and between Draeger Medical Systems, Inc. ("Draeger") and **William Liptrot**.

**WHEREAS,** Draeger wishes to acknowledge your value to the Company and to obtain your commitment to continue serving as **VP, Div Research & Development** through and including March 27, 2027, to enable Draeger to meet its commitments to Project Fulcrum.

**WHEREAS**, in exchange for the promises below, including but not limited to your confidentiality commitment, Draeger is offering you a retention bonus to encourage you to remain in its employ until at least **March 27, 2027**.

**WHEREAS**, you desire to accept such retention bonus under the following terms and conditions.

**NOW, THEREFORE**, intending to be legally bound, it is agreed by and between the parties hereto as follows:

1. Retention Period. You agree to continue to serve as Vice President, Global Functions Telford, Medical & Safety of Draeger from the date of this Agreement through and including March 27, 2027.This period shall be referred to in this Agreement as the "Retention Period."

2. Job Responsibilities. During the Retention Period, we expect you to perform your current role and duties assigned in addition to other duties assigned as required for the success of the business.

3. Agreement to Refrain from Commencing Other Employment. You agree that during the Retention Period you will refrain from commencing any other employment that would otherwise interfere with your ability to work your regularly scheduled hours at Draeger.

4. Retention Bonus Payment. In recognition of your agreement to continue in the employ of Draeger, if you comply with the terms of the Retention Agreement, Draeger agrees to pay you the following extraordinary compensation: the gross amount equal to **$50,000.00** ("Retention Bonus"), to be paid to you in two installments of **$25,000.** The first will be paid to you on or about the pay date for first payroll period beginning after March 27, 2026 and the second will be paid to you on or about the pay date for the first payroll period beginning after March 27, 2027; provided, you are employed on the March 27 of reference.

5. Payroll Withholding and Other Compensation Matters. For payroll purposes, any Retention Bonus payment will be treated as a special bonus payment and will be subject to federal, state, and local income taxes, FICA taxes and any other withholdings required by law. Retention Bonus payments do not count towards your annual compensation in the year it is received for any purposes related to the Draeger U.S. Retirement Savings Plan, including but not limited to any elective deferral, Draeger matching. or Draeger discretionary contributions.

6. Termination of Employment.

(a) *Involuntary Termination by Draeger*. Your employment may be terminated by Draeger with or without cause during the Retention Period, effective upon written notice of termination to you.

(i) *Involuntary Termination Not For Cause*. If you are terminated by Draeger before the end of the Retention Period for any reason other than "For Cause" as defined below, Draeger will pay you the full Retention Bonus as described herein, so long as all other terms of the Agreement have been met.

(ii) *Involuntary Termination for Inability to Work Full-Time During Retention Period.* If, during the Retention Period, you die or become unable to work full-time *for any reason*, including a Disability, this Agreement terminates immediately, unless otherwise agreed by the parties, and Draeger will pay you a Pro-rata Retention Bonus (to be solely defined by Draeger).

(iii) *Definition of Disability*. For purposes hereof, the term "Disability" shall mean an incapacity by accident, illness or other circumstances which renders you mentally or physically incapable of performing the duties and services required hereunder on a full-time basis for a period of at least fifteen (15) business days or more during any thirty (30) day period. The parties agree that this short-term definition of Disability is reasonable in light of the relatively short length of the Retention Period.

(iv) *Involuntary Termination For Cause*. If, during the Retention Period, you voluntarily resign, or are terminated "For Cause," then this Agreement terminates immediately and you shall forfeit any right to receive any further benefits hereunder, including without limitation the Retention Bonus Payment. For purposes of this Agreement, "For Cause" means:

(A) your failure to perform material duties of your position, and such failure, if correctable (as determined by Draeger in its sole discretion), remains uncorrected for a period of up to five (5) days after receipt by you of written notice of such failure from Draeger, which notice shall contain a reasonably specific description of such breach and the specific reasonable correction requested by Draeger;

(B) any reckless or grossly negligent act by you having the foreseeable effect of injuring the interest, business, or reputation of Draeger, or any of its parent, subsidiaries, or affiliates in any material respect.

(C) your evidenced impairment by or use of any illegal drug, or illegal narcotic, or excessive amounts of alcohol (as determined by Draeger in its reasonable discretion) on Draeger property, while performing Draeger work (including at a customer site) or at a function where you are working on behalf of Draeger.

(D) the indictment on charges or conviction for (or the procedural equivalent or conviction for) or entering of a guilty plea or plea of no contest with respect to, a felony.

(E) the conviction for (or the procedural equivalent or conviction for) or entering of a guilty plea or plea of no contest with respect to, a misdemeanor which, in Draeger's reasonable judgment, involves moral turpitude, deceit, dishonesty or fraud.

(F) conduct by or at the direction of you constituting misappropriation or embezzlement of the property of Draeger, or any of its parents or affiliates.

(G) a breach by you of a fiduciary duty or duty of loyalty owing to Draeger, including the misappropriation of (or attempted misappropriation of) a corporate opportunity or undisclosed self-dealing.

(H) a material breach of any of Draeger's written Human Resources or other company policies, which breach, if correctable (as determined by Draeger in its sole discretion), remains uncorrected for a period of up to five (5) days after receipt by you of written notice of such breach from Draeger, which notice shall contain a reasonably specific description of such breach and the specific reasonable correction requested by Draeger; or

(I) a material breach by you of any material provision of this Agreement, which breach, if correctable (as determined by Draeger in its sole discretion), remains uncorrected for a period up to five (5) days after receipt by you of written notice of such breach from Draeger, which shall contain a reasonably specific description of such breach and the specific reasonable correction requested by Draeger.

(b) *Voluntary Resignation of Employment by You.* In the event that you voluntarily resign from your employment at Draeger prior to the end of the Retention Period, such cessation of employment shall constitute a breach of this Agreement and you shall not be entitled to any further benefits hereunder, including, without limitation, the Retention Bonus.

7. Confidentiality. The terms of this Agreement, including the amount of the Retention Bonus, are highly sensitive and confidential. You agree not to disclose the terms of or the existence of this Agreement or the receipt of the Retention Bonus, except to comply with applicable law or as permitted in the next sentence. You may discuss these matters only wit Draeger's President Global Functions, President Regional Functions, Head of Human Resources, or HR Business Partner for the US Global Business, or with the Director CareArea Intensive Care and CareArea Neonatal Care of Drägerwerk AG & Co. KGaA, or with, your immediate family, your attorney and financial advisors, or as authorized by law, including pursuant to the National Labor Relations Act. **If this confidentiality provision is breached, you waive all rights to the Retention Bonus Payment, and you agree to return any amount which you have already received pursuant to this Agreement.** In addition, unauthorized disclosure of any matters related to this Agreement by you shall constitute grounds for termination For Cause. Nothing in this

Agreement, however, is intended to or shall interfere with your right to file a charge or participate in an investigation or proceeding with the National Labor Relations Board, the Equal Employment Opportunity Commission, or comparable state or local fair employment practices agencies.

8. Employment-at-Will. This Agreement is not intended to be and shall not be interpreted as an employment contract. Nothing in this Agreement modifies your status as an employee-at-will or guarantees employment for any length of time.

9. Entire Agreement. This Agreement constitutes the only agreement between you and Draeger, superseding in all respects any and all prior oral or written agreements or understandings pertaining to the subject matter hereof, and can be amended or modified only in writing signed by both you and the VP of Human Resources, Draeger, NA. This Agreement shall not be interpreted in any way to reduce or limit any restrictive covenants contained in other agreements signed by you.

10. Assignment. This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by, the parties hereto and their respective heirs, successors, and assigns, but this Agreement shall not be assignable by you. Draeger may assign this Agreement in connection with a merger, consolidation, assignment, sale or other disposition of its business or assets.

11. Severability. If any provision of this Agreement is or shall be declared invalid or unenforceable by a court of competent jurisdiction, the remaining provisions shall not be affected thereby and shall remain in full force and effect.

12. General. The terms of this Agreement will be governed, enforced, and construed under the substantive laws of the Commonwealth of Pennsylvania, without regard to its conflict of laws principles.

**IN WITNESS WHEREOF**, the parties have executed this Agreement under seal as of the date first written above.

**William Liptrot**

**DRAEGER MEDICAL SYSTEMS, INC.**

By:

**Stephanie Moody**
**SVP Human Resources – NA**

By:

**Lothar Thielen**
**President and Regional CEO**

# Exhibit B

***PERSONAL AND CONFIDENTIAL***
***Delivered in person***

August 11, 2025

William Liptrot
29 Tempo Road
Levittown, PA 19056

Dear Pete:

As discussed with you, this letter confirms the termination of your employment with Draeger Medical Systems, Inc., including all its affiliates (collectively, "Draeger"), effective today, Monday, August 11, 2025. After careful review, Draeger has determined that your termination is "for cause" under the terms of both the Draeger U.S. Severance Benefit Plan (the "Severance Plan") and your Retention Agreement, dated March 27, 2025 (the "Retention Agreement"), based on several factors, including but not limited to your failure to perform the material duties of your position, reckless or grossly negligent actions that could reasonably be expected to have or had a detrimental impact on the interests, business, or reputation of Draeger, and violation of material provisions of Draeger's company policies. As such, you will not be entitled to any severance benefits or retention bonus payments under either agreement.

**A. Termination Date and Final Payment.** Your employment with Draeger will cease on August 11, 2025 (the "Termination Date"). Your final paycheck, which includes wages through your final day of employment, will be processed on Friday, August 15, 2025, less all applicable payroll deductions. Any accrued unused PTO will be paid out in the same payroll.

**B. Health Benefits Continuation.** Draeger will continue your and your dependents' enrollment in its group health insurance plans (including medical, prescription, and/or dental), if any, through August 31, 2025. If applicable, you will receive a separate notice regarding your right to elect continued health coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA").

**C. Other Benefits.** Your participation in, and entitlement to, all other Draeger benefits (including fringe benefits and employee benefit programs) will terminate as of your Termination Date, August 11, 2025. If you have purchased group life insurance coverage through Draeger, you may convert that to an individual policy.

**D. Return of Corporate Property and Associated Expenses; Non-Deletion of Data.** Upon termination of your employment with Draeger, or at any other time upon request, you must immediately return all Draeger property to Human Resources. This includes, but is not limited to, laptops, hard drives, mobile phones, portable storage devices (with passwords), credit and

membership cards, keys and access cards, notebooks, and any proprietary or confidential Draeger information.

An email will be sent to your personal email account with FedEx information, including a QR code for you to return all items at no cost to you. All Draeger equipment, along with the corresponding laptop and mobile device passcodes (including iCloud/iTunes user ID), must be returned by **end of business on Friday, August 15, 2025**.

You agree not to delete any Draeger-owned or business-related information from any devices and to cooperate fully with Draeger in accessing any information on such media. You are also required to provide Draeger with any Draeger data or information stored on your personal devices and delete it from those devices after the information has been received by Draeger. Additionally, you must reimburse Draeger for any personal expenses incurred on corporate credit cards prior to your termination. Your access to such corporate property and to Draeger facilities will cease on the Termination Date.

**E. Continuing Obligation of Confidentiality.** Please be reminded that you remain bound by your obligations to maintain confidentiality with respect to all proprietary and confidential information acquired during your employment. Further, you must ensure the transfer of any intellectual property created or contributed to during your time at Draeger. Should you need a copy of the agreement outlining these obligations, please contact me.

**F. References.** Draeger utilizes The Work Number for employment and/or income verification. The Work Number can be accessed toll free at 866.604.6572 or www.theworknumber.com. The employer code is 16362. For an income verification, you will need to obtain a salary key code by contacting The Work Number and following the directions provided. The organization verifying employment will need the employer code and salary key (if verifying salary) to obtain the information from The Work Number.

**G. For Cause Termination and Impact on Benefits.** As outlined above, your termination is deemed for cause, as defined in both the Severance Plan and the Retention Agreement. Based on this determination, you are not eligible for severance benefits under the Severance Plan or for any retention bonus payments under the Retention Agreement. This is due to the conduct that led to your termination, which Draeger has determined meets the criteria for "for cause" termination as specified in both agreements.

Should you have any additional questions, please contact me at (267) 374 5191.

Sincerely,

Danielle Baker

Danielle Baker
Director, HR Business Partner

# Exhibit C

Dräger Technology for Life

To: J. Patrick Griffin, Esq.,
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053

From: Draeger U.S. Benefits Committee (Plan Administrator)

***Via Email and First Class Mail***
**Re: William Liptrot v. Draeger Medical Systems, Inc.**

Dear Patrick,

We write in response to your letter received on October 27, 2025, in which you made a formal request for benefits under Draeger's severance plan on behalf of your client, William Liptrot. This request for benefits must be denied for two independent reasons.

As an initial matter, the request for benefits was not timely submitted. Your initial correspondence with Draeger dated September 22, 2025 made express references to the Draeger U.S. Severance Benefit Plan and Summary Plan Description (the "Plan"), confirming that you were in possession of the Plan and had access to its terms at all relevant times. Accordingly, both you and your client had full notice of the applicable deadlines governing any request for benefits. Notwithstanding this notice, the request was submitted to the Plan Administrator on October 27, which was 77 days after Mr. Liptrot's termination of employment on August 11, 2025. This is well beyond the 45-day deadline for submitting such a request as set forth in Section 10 of the Plan. For this reason alone, Mr. Liptrot's request for severance benefits is denied.

In addition, and independently, Mr. Liptrot is not eligible for benefits under the Plan because his employment was terminated for cause. Specifically, Mr. Liptrot's termination resulted from serious misconduct, including but not limited to, making unfounded and unauthorized promises to employees about the expected duration of their employment and the severance benefits to which they would be entitled to receive, falsely suggesting that he was sole-decision maker on important company matters, disclosing details of a prior confidential workplace investigation, disparaging the Human Resources team, and causing employees to believe they would be subject to retaliation if they discussed his actions or statements with others. Mr. Liptrot's actions reflect a failure to perform material duties of his position, reckless and grossly negligent actions having a foreseeable effect of harming Draeger's business, a breach of his fiduciary duties including the duty of loyalty, a violation of Draeger's Human Resources policies, and a clear breach of his responsibilities. Such

Dräger



conduct plainly constitutes "Cause" as defined under Section 2(f) of the Plan, rendering Mr. Liptrot ineligible for any severance benefits. Accordingly, the Draeger U.S. Benefits Committee, as Plan Administrator, further and independently denies the request on these additional grounds.

Pursuant to the Plan, Mr. Liptrot has the right to appeal this determination by submitting a written request for review to the Plan Administrator within sixty (60) days of receipt of this notice. Any such appeal must be addressed to the Draeger U.S. Benefits Committee, c/o Draeger, Inc., 3135 Quarry Road, Telford, PA 18969, and must clearly set forth all grounds for the appeal, all supporting facts, and any materials the claimant believes are relevant.

As provided by the Plan, no legal action for benefits may be initiated unless and until all required administrative procedures have been fully exhausted, including the submission and denial of an appeal. Further, any legal action arising out of or relating to a claim for benefits must be brought within one hundred eighty (180) days after written notice of the denial of an appeal, and this limitations period will not be extended absent an express determination by the Plan Administrator. This limitations period applies to all actions arising out of or relating to a claim for benefits, including, without limitation, any action asserted under Section 502(a)(1)(B) or Section 502(a)(3) of ERISA to the extent such action concerns the provision of benefits or rights under the Plan. The Plan Administrator retains sole and maximum discretionary authority to interpret the Plan, make factual determinations, and decide claims for benefits, and its decisions are final and binding unless determined to constitute an abuse of discretion.

Sincerely,

*Donna M. Hill*

Donna M. Hill
Member, Draeger U.S. Benefits Committee

cc: Michael Banks, Esq.
Draeger Legal Department

# Exhibit D

Dräger Technology for Life

To William (Pete) Liptrot
29 Tempo Road
Levittown, PA 19056

c/o J Patrick Griffin, Esq.
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053

***Via Email and First-Class Mail***

**Re: Appeal of Denial of Claim for Severance Benefits**

Dear Pete,

The Draeger US Benefits Committee (the "Committee") has received and reviewed your appeal dated April 10, 2026, submitted pursuant to Section 10(c) of the Draeger U S Severance Benefit Plan and Summary Plan Description (the "Plan") After careful consideration of the appeal, the administrative record, and all information available to the Committee, the appeal is denied The Committee's determinations that you were terminated for "Cause," as defined under the Plan, and that your claim was untimely are hereby affirmed The reasons for this determination are set forth below

## I. The Claim for Benefits was Untimely and Procedurally Deficient

The contention that the September 22, 2025 letter constituted a timely claim for benefits under the Plan is unsupported by the record The plain text of that letter contradicts the assertion, and the attempt to recharacterize it now as a benefits claim does not retroactively cure a clear failure to comply with the Plan's claims procedures

### A. *The September 22 Letter Was Not Directed to the Plan Administrator and Does Not Constitute a Claim for Benefits*

The Plan requires that a claimant "submit a written claim to the Plan Administrator" within forty-five (45) days of the date of the denial or receipt of the disputed benefit Your employment with the Company was terminated on August 11, 2025. The 45-day deadline to submit a claim therefore expired on or about September 25, 2025

Dräger



The September 22, 2025 letter was not directed to the Plan Administrator or the Benefits Committee. It was sent via email to Donna Hill, EVP & General Counsel, North America – an individual who is not the entity designated to receive benefit claims. The Plan identifies both the Plan Administrator and the specific address to which any written claim must be submitted. The decision to direct this correspondence elsewhere is, standing alone, fatal to any assertion that the letter constituted a valid claim.

The substance of the letter independently confirms it was not a benefits claim. By its own terms: "*The purpose of this letter is [to] put Draeger on formal notice of pending litigation under state and Federal law and ensure that document preservation and retention steps are immediately undertaken.*" That is what the letter says it is – a litigation notice and a preservation demand. It does not request that the Plan Administrator review or pay benefits. It does not reference Section 10 of the Plan or its claims procedures. It requests nothing of the Benefits Committee.

The appeal asks the Committee to ignore the plain language of that letter in favor of what it wishes it had said. But that is not interpretation; it is revision. The letter is unambiguous, and the Committee declines to adopt a reading that contradicts its express terms.

### B. *The Appeal's Timeline is Contradicted by its Own Correspondence*

The first communication addressed to and received by the Benefits Committee was the letter from your counsel dated October 23, 2025, which arrived by mail on October 27, 2025. That letter submits a claim for benefits under the Plan and references the procedural processes in Section 10. It also includes a blanket assertion that it is being submitted within 45 days of the denial of benefits; however, it does not identify when such denial allegedly occurred or provide any basis to substantiate timeliness.

The timeline presented in the appeal is also internally contradictory. The appeal asserts that Mr. Banks "formally den[ied] [my] claim for benefits" via letter dated October 10, 2025, and that you then made "another claim for [] benefits" via the October 23 letter. But if the September 22 letter was genuinely believed to constitute a valid claim – and the October 10 letter a formal denial of that claim – the appropriate next step would have been to submit an appeal under Section 10(c), not another claim. The fact that you chose to submit a claim rather than appeal a purported denial shows that no prior claim was believed to exist. Indeed, the October 23 letter makes no reference to any earlier claim, does not seek reconsideration, and does not attempt to preserve the September 22 letter as a valid claim. Its content is consistent with it being a first-time claim, submitted more than a month after the deadline had passed.

Dräger



The characterization of Mr. Banks' October 10, 2025 letter as a formal denial of benefits is likewise unsupported by its text. That letter did not deny a claim; it identified the Plan's claims procedures and "suggest[ed] that you follow the procedure specified in the Plan" should you wish to submit one. A suggestion to follow the proper procedure is not a denial, it is a direction to a process that had not yet been invoked. The appeal misconstrues that letter as containing a claim determination found nowhere in its text, in an apparent effort to manufacture a denial event that would restart the 45-day clock and retroactively render the October 23 letter timely. However, the letter does not support that reading, and the Committee declines to adopt it.

### C. *The Record Demonstrates Knowledge of and Access to the Plan*

The appeal contends that you could not have complied with the Plan's claims procedures because you were never provided a copy of the Plan. The record contradicts this. The Plan was available to all eligible employees on the Company's internal resource platform, "D.World." You were also directly involved in the NCT transition process, which required discussion and application of employees' severance rights under this same Plan. The assertion that you had no knowledge of or access to a document whose terms you were actively discussing with other employees is not credible.

The September 22 letter independently confirms this. Your letter explicitly references the definition of termination for "Cause" under the Plan, demands that the Company "satisf[y] its obligations under the Severance Plan and Retention Agreement," and threatens litigation for non-compliance with those obligations. Knowledge of those terms could only have come from reviewing the Plan itself. You cannot cite the substantive provisions of an agreement to support a purported claim while simultaneously asserting ignorance of its procedural requirements. Accordingly, your own correspondence demonstrates possession of the Plan, comprehension of its terms, and a deliberate choice to threaten litigation rather than submit a benefit claim.

## II. <u>Termination for Cause was Substantiated and Supported by the Record</u>

Even if the claim were deemed timely, the denial would nonetheless be affirmed on the merits. You were terminated for "Cause" as defined under the Plan following an internal investigation and deliberation by the Company. The appeal does not rebut the factual bases for that decision. It offers conclusory denials, references of unnamed and unverified witnesses, and attempts to discredit a single complainant while ignoring the full scope of the evidence. The Committee finds no basis to change its original determination.

Dräger



### A. *The Investigation was Contemporaneous, Independent, and Corroborated by Multiple Sources*

The termination decision was based on an internal investigation that included interviews of at least a half dozen separate employees, review of relevant documentation, and deliberation by the Company. The investigation was initiated by HR based on employee reports. After determining that you had made inappropriate comments regarding the HR department and its members, the investigation was transferred to the Legal department to ensure independence and avoid any conflict of interest. Additional employees were interviewed, and the same core allegations were substantiated.

The results of that investigation were relayed to senior leadership, who deliberated on Friday, August 8, 2025, and determined that your conduct constituted "Cause" under the Plan. Thereafter, the necessary paperwork was prepared, and the termination decision was issued to you on Monday, August 11, 2025. This was a real-time decision based on contemporaneous evidence – not a post-hoc narrative constructed for litigation.

### B. *Failure to Rebut the Factual Bases for Termination*

Despite multiple opportunities over many months to explain why your termination for Cause was not justified under the Plan, you have not engaged with the substance of the allegations. The appeal again declines to address the factual bases for the decision and instead offers only the conclusory assertion that the alleged conduct is "patently and provably false" – without explanation, evidence, or any specific rebuttal the Committee can evaluate.

Characterizations of the allegations as "laughable," a "joke," and "outright ridiculous" are not evidence. Unnamed witnesses offering generic praise that you were "supportive," "understanding," and "genuine" have no bearing on whether the specific conduct described in Mr. Banks' October 10, 2025 letter and the subsequent denial occurred. It offers no alternative account of events and gives the Committee no basis to reach a different conclusion.

Dräger



C. ***The Evidence is Documented and Corroborated***

The Committee's determination is supported by documented, corroborated evidence, including but not limited to:

- A sworn affidavit from a former employee confirming the core allegations and a fear of retaliation based on your conduct;
- At least two emails received shortly after your termination from employees inquiring about benefits you had promised but that had never been approved by the Company; and
- Consistent statements from multiple employees interviewed during the investigation, that independently substantiated the core allegations.

In light of this record, the assertion that you "never once" engaged in the conduct at issue is contradicted by documentary evidence and lacking in candor. It provides no basis for the Committee to revisit its determination and raises serious questions about the credibility of the appeal as a whole.

D. ***Unverified Post-Termination Statements Do Not Undermine the Record***

The appeal references unnamed individuals who purportedly describe you in favorable terms. Post-termination statements from unidentified persons – whose existence, identities, and statements have not been verified or produced to the Committee – cannot retroactively undermine a decision based on information that was verified, available, and reasonable at the time it was made. Blanket praise regarding personality traits has no relevance to whether you engaged in the specific conduct alleged. And notably, the appeal does not identify these individuals by name, produce their statements, or explain with any specificity what they purport to have witnessed. Given your repeated refusal to address the underlying facts, the Committee has been given no reason to deviate from its determination.

The characterization of Kelly Harden as a "disgruntled employee" whose complaints should be discounted is noted but unpersuasive. Ms. Harden was not the sole source of the information underlying the termination, as multiple employees corroborated the same core facts, and the investigation was not limited to her report. The attempt to reduce this matter to a single complainant misrepresents the scope of the investigation and the breadth of the evidence. Regardless of how you characterize Ms. Harden, it does not change the fact that she reported fear of retaliation from you, and her assertions were determined to be credible and realistic. Her fear is not a matter of opinion or characterization; it is something the Company was obligated to take seriously, and did.

Dräger



### III. Draeger Has Acted in Good Faith and in Accordance with the Plan's Procedures

The accusation that Draeger has "proceeded in bad faith at every turn" is unsupported. The Company's request for additional time to issue the initial determination was based on a legitimate special circumstance expressly contemplated under Section 10(b)(iv) of the Plan: a member of the Benefits Committee was on leave due to a serious medical condition. That the Company's approach remained consistent throughout this process, from Mr. Banks' October 10, 2025 letter through the determination, reflects the strength of its position, not bad faith. The Committee further notes that baseless accusations of bad faith are not a substitute for substantive argument and asks that any future correspondence be limited to the merits of the claim.

### IV. Request for Written Comments, Documents, Records, and Other Information

Pursuant to Section 10(c) of the Plan, the Committee acknowledges the request for all written comments, documents, records, and other information relevant to your claim. The following documents are enclosed:

- ***Exhibit A***: Relevant emails, including communications relating to the investigation and termination decision.
- ***Exhibit B***: Relevant documents, records, and other information, including sworn statements and information considered by the Company in reaching its decision.

### V. Conclusion

For the reasons set forth above, your appeal is denied. The Committee's original determination is affirmed on both grounds: (i) your claim for benefits was untimely and procedurally deficient, and (ii) your termination was for "Cause" as defined under the Plan.

This constitutes the final adverse benefit determination of the Plan Administrator. Pursuant to Section 10(c) of the Plan, you have the right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA").

Dräger



Sincerely,

Stephanie Moody
Digitally signed by Stephanie Moody
Date: 2026.06.09 12:35:36 -04'00'

Draeger U.S. Benefits Committee

cc: Michael Banks, Esq.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

# CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| William P. Liptrot | : | CIVIL ACTION |
| v. | : | |
| Drager Medical Systems, Inc. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (x )

| 8/26/2026 | [signature] | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## DESIGNATION FORM

Place of Accident, Incident, or Transaction: Defendants place of business

***RELATED CASE IF ANY:*** Case Number:__________ Judge:__________

1. Does this case involve property included in an earlier numbered suit? Yes ☐
2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes ☐
3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes ☐
4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes ☐
5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

**Civil Litigation Categories**

***A. Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☒ 8. Employment
- ☐ 9. Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief ***see certification below***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:__________

**B. *Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury (*Please specify*):__________
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*__________

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

[X] Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

[ ] None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

LIPTROT, WILLIAM P.

**(b)** County of Residence of First Listed Plaintiff: Bucks

*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

## DEFENDANTS

DRAGER MEDICAL SYSTEMS, INC.

County of Residence of First Listed Defendant: Bucks

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - mployment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [X] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***: ERISA (29USC1132)

Brief description of cause: Violations of ERISA, WPCL and Pennsylvania Common Law.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:** [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE 8/26/2026

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______